UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

      Plaintiff,

v.

Douglas Ray Thomas

      Defendant.

Criminal No. 18-218 (JNE/LIB)
Civil No. 21-107 (JNE)
ORDER

This matter is before the Court on Defendant's Motion to Vacate, Set Aside, or Correct his Sentence Pursuant to 28 U.S.C. § 2255. ECF No. 74. The Government opposes Defendant's motion. ECF No. 86. For the reasons stated below, the Court denies Defendant's motion without an evidentiary hearing and does not issue a certificate of appealability.

## BACKGROUND

Defendant fraudulently induced the former owners of Northwoods Trucking, Inc. ("NWT") into selling him the company. Defendant misrepresented his financial condition and purchased all outstanding shares of NWT for $730,000. He did not comply with his obligations under the purchase agreement, but instead began extracting revenue to use for his personal expenses. When NWT's prior owners, the victims of Defendant's offense, realized what was happening, they attempted to intercept NWT's revenue and keep NWT afloat, but to no avail.

A grand jury charged Defendant with six counts of wire fraud and two counts of failure to account for and pay over employment taxes. Defendant ultimately pleaded

1

guilty to one count of wire fraud and one count of failure to account for and pay employment taxes. Defendant's plea agreement noted the parties disagreed on the loss amount. The Government believed the intended loss amount was between $550,000 and $1,500,000, increasing the offense level by fourteen points. Defendant reserved the right to argue for a lower loss amount.

The Presentence Investigation Report ("PSR") found that the loss amount was $730,000, falling within the range that increased the offense level by fourteen points. The PSR considered the fact that Defendant paid some of NWT's liabilities, but found these payments did not warrant credit because they did not reimburse the victims. Defense counsel filed objections to the PSR. Though counsel did not explicitly object to the loss amount calculations in the PSR, he objected to a paragraph describing the offense conduct. Counsel pointed out that the PSR did not mention the rent Defendant paid to the victims, the value of the services Defendant rendered in running NWT, or the value of the assets returned to the victims after NWT was shut down.[1] Defense counsel also filed supplemental documents and information for consideration with the PSR. These documents included evidence of the victims' attempts to intercept NWT's revenue to keep the company in business.[2]

---

[1] In his objection to the offense conduct, counsel wrote, "The Defendant objects to no value being assigned to these assets, which should be applied to reduce the loss under Application Note 3(E)(i)."
[2] There is significant overlap between these documents and the exhibits Defendant has filed with the instant motion.

In its sentencing position pleading, the Government argued that the loss amount was $730,000. Defense counsel argued for leniency under the general sentencing factors in 18 U.S.C. § 3553(a).

At the sentencing hearing, the Government credited Defendant with two repayments, lowering the loss amount to $634,665. This loss amount was still within the original, contemplated loss range which increased the offense level by fourteen points. Defense counsel stated there were no objections to the calculations in the PSR and the Court subsequently adopted the PSR guideline calculations. The recommended imprisonment sentence was between forty-one and fifty-one months.

Defense counsel then focused his oral arguments on the restitution amount and the general sentencing factors.

The Court sentenced Defendant to fifty-one months' imprisonment to be followed by a two-year term of supervised release. The Court noted that while it granted Defendant the points for acceptance of responsibility, it did so reluctantly.

## DISCUSSION

A federal prisoner may move to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. Ineffective assistance of counsel claims are properly raised through § 2255 motions. *See Massaro v. United States*, 538 U.S. 500, 509 (2003); *United States v. Ramirez-Hernandez*, 449 F.3d 824, 826-27 (8th Cir. 2006). However, "[a] defendant 'faces a heavy burden' to establish ineffective assistance of counsel pursuant to section 2255." *Deroo v. United States*, 223 F.3d 919, 925 (8th Cir. 2000) (quoting *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996)).

## I. Ineffective Assistance of Counsel

Criminal defendants, with some exceptions, are entitled to effective assistance of counsel under the Sixth Amendment. U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 685 (1984). To prevail on an ineffective assistance of counsel claim, a defendant must meet a two-part test. *Strickland*, 466 U.S. at 687. Courts do not have to evaluate both parts of the *Strickland* test if a defendant fails to establish one. *Deroo*, 223 F.3d at 925.

First, a defendant must show counsel's performance was deficient. *Id.* "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

Second, a defendant must show that counsel's deficient performance prejudiced the defense. *Id.* at 687. Specifically, a defendant must establish a reasonable probability that the result of the proceeding would have been different but for counsel's deficient performance. *Id.* at 694. "When a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *United States v. Mulverhill*, 833 F.3d 925, 930 (8th Cir. 2016) (quoting *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345 (2016)).

Here, Defendant argues that his former counsel unreasonably erred by failing to argue for a lower intended loss amount at sentencing, which would have led to a lower guidelines range. According to Defendant, the intended loss amount calculations should

4

have included NWT's "misrepresented liabilities" and the "benefits" the victims obtained prior to the fraud's detection.

### a. Performance

Defendant has not shown that his former counsel's performance was deficient. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (quoting *Strickland*, 466 U.S. at 690). *Calkins v. United States*, 795 F.3d 896 (8th Cir. 2015), presents an instructive example. The defendant in *Calkins* argued that her attorney should have contested the PSR's loss amount calculation instead of focusing on leniency under the § 3553(a) factors. 795 F.3d at 897. The court of appeals found that the defendant had "not met her burden of proving that her lawyer's actions were not a valid trial strategy." *Id.* at 898 (internal quotations omitted). The record showed that counsel had reviewed the government's evidence on the loss amount before recommending the defendant request leniency under § 3553(a). *Id.* at 897. The recommendation was based in part on the risk of the defendant losing a sentence reduction for acceptance of responsibility. *Id.*

Conversely, in *Ryder v. Morris*, defense counsel's failure to avail himself of the opportunities to discover evidence related to and rebutting the PSR may have constituted deficient performance. 752 F.2d 327, 332 (8th Cir. 1985) (citations omitted). A lawyer has a duty to "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* (quoting *Strickland*, 466 U.S. at 691).

5

Here, defense counsel's decision to forgo arguing the loss amount was a strategic choice, not deficient performance. Like *Calkins*, the record shows counsel reviewed loss evidence before making a deliberate choice to pursue the leniency argument. 795 F.3d at 897. For example, counsel had reserved the right to argue for a lower loss amount in the plea agreement. Plea Agreement 5, ECF No. 43. Moreover, counsel submitted evidence concerning the loss amount to the Court. Notice of Def.'s Suppl. Docs., ECF No. 55. There was no failure to investigate as discussed in *Ryder*. 752 F.2d at 332.

Furthermore, focusing on restitution and § 3553(a) was a sound strategic choice given the benefits Defendant received and the benefits Defendant hoped to receive. Defendant obtained the acceptance of responsibility points despite the Court's reluctance. *See Calkins*, 795 F.3d at 897-98 (approving of counsel's choice to not "risk losing a reduction for acceptance of responsibility by disputing loss amount" (internal quotations and citation omitted)). It is also possible that the Court would have given Defendant an even higher sentence had defense counsel not focused on leniency. The Court sentenced Defendant at the top of the guideline range. The guideline range was determined in part by Defendant's criminal history score, which may have been understated. Defendant received a criminal history score of zero even though his criminal history included a conviction for fraud on a financial institution and there was evidence Defendant engaged in a similar fraudulent conduct with respect to five other businesses.

Because Defendant cannot establish counsel's deficient performance, his ineffective assistance of counsel claim fails. *See Deroo*, 223 F.3d at 925.

### b. Prejudice

Even assuming Defendant could show that counsel's failure to argue the loss amount was an oversight, Defendant cannot establish a reasonable probability that he would have been sentenced under a lower guidelines range but for that oversight. *See Strickland*, 466 U.S. at 694; *see also Thomas v. United States*, 951 F.2d 902, 904 (8th Cir. 1991) (finding counsel's failure to raise a meritless argument cannot constitute ineffective performance). When calculating the loss amount, the Court uses "the greater of the actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A); *United States v. Oligmueller*, 198 F.3d 669, 671 (8th Cir. 1999). The intended loss "means the pecuniary harm that the defendant purposely sought to inflict" even if it "would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1 cmt. n.3(A)(ii); *United States v. Smith*, 929 F.3d 545, 547 (8th Cir. 2019) (citations omitted). In other words, intended losses cover "what the fraud was *designed* to cause the [victims] to lose." *United States v. Luna*, 968 F.3d 922, 928 (8th Cir. 2020) (emphasis in original) (citing *United States v. Wells*, 127 F.3d 739, 746 (8th Cir. 1997)). The loss amount shall be reduced by the "money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1 cmt. n.3(E)(i). "The Court need only make a reasonable estimate of the loss." *Id.* at § 2B1.1 cmt. n.3(C)*; United States v. Karie*, 976 F.3d 800, 804 (8th Cir. 2020).

### i. Credit for the Misrepresented Liabilities

According to Defendant, the victims mispresented two of NWT's liabilities when selling NWT: (1) uncashed payroll checks issued prior to NWT's transfer but not cashed at the time of the sale ($8,958); and (2) two equipment leases represented as free and clear ($27,000). Defendant claims that the business was improperly valued at $730,000 due to these misrepresentations. Because he intended only to gain control of the business, Defendant argues these liabilities should be deducted from his intended loss.

Counsel's failure to make this argument did not prejudice Defendant. Defendant believed NWT was worth $730,000 and "purposely sought to inflict" $730,000 worth of harm even if it "would have been impossible or unlikely to occur" due to the misrepresented liabilities. U.S.S.G. § 2B1.1 cmt. n.3(A)(ii). If a bank robber demanded a bank teller put $1,000 in his bag only to discover the teller put $900 into the bag, the bank robber still intended to steal $1,000. Regardless of whether Defendant was correct in his valuation of NWT at $730,000, "the fraud was *designed* to cause the [victims] to lose" $730,000.[3] *Luna*, 968 F.3d at 928 (emphasis in original) (citing *Wells*, 127 F.3d at 746).

Defendant's reliance on *United States v. Staples*, 410 F.3d 484 (8th Cir. 2005) is misplaced. *Staples* held that a sentencing court should subtract collateral from an intended loss amount if the defendant intended for the collateral to revert to the defrauded party or knew it would. 410 F.3d at 490. There, the defendant bought a house with a fake

---

[3] As mentioned above, Defendant was ultimately credited for two repayments, lowering the loss amount to $634,665.

check and the bank distributed part of the sale money to the seller, a participant in the fraud, before discovering the check was fake. *Id*. at 489. The defendant could not have intended to defraud the bank of the apparent value of the house because a reasonable person would have known that the bank could sell the house to mitigate damages. *Id.* at 491. Therefore, the apparent value of the house should have been deducted when calculating the intended loss. *Id.* Here, Defendant is arguing about liabilities, not collateral. Moreover, Defendant did not know about the "misrepresented" liabilities. Therefore, he could not have intended for the misrepresented liabilities to mitigate the victims' damages.

Defendant's reliance on *United States v. Christopher*, 142 F.3d 46 (1st Cir. 1998) is also misplaced. The court in *Christopher* used a net-loss approach because it was calculating actual loss, not intended loss. 142 F.3d at 56; *see also United States v. Belfrey*, 928 F.3d 746, 750 (8th Cir. 2019) (explaining that courts use a net loss approach when calculating actual loss).

In his reply brief, Defendant contends that the Eighth Circuit's recent decision in *United States v. Ruzicka*, 988 F.3d 997 (8th Cir. 2021), indicates that the net-loss approach applies to intended loss as well. The Court disagrees. In *Ruzicka* the actual loss amount equaled the intended loss amount. 988 F.3d at 1012. There was no need to credit any value conferred to the victim because there was no value conferred to the victim. *Id.* Additionally, the court in *Ruzicka* cited *United States v. Markert*, 732 F.3d 920, 932 (8th Cir. 2014) for the proposition that "*actual loss* under the revised guideline is a net loss concept." *Id.* (emphasis added).

Essentially, Defendant is arguing that the misrepresented liabilities should be credited against his intended loss under a net-loss approach because they affected the value of the company he intended to obtain. Defendant cannot establish a reasonable probability of a different outcome but for counsel's failure to make this argument as this argument ignores the fact that Defendant never intended for these "misrepresented" liabilities. Defendant intended to fraudulently obtain a company he valued at $730,000.

> ii. Credit for the Benefits Obtained by the Victims Prior to the Fraud's Detection

Defendant also claims that the following five benefits to the victims should be included when calculating the intended loss: (1) the brokerage fee for NWT's sale ($35,000); (2) the conversion of a Chevrolet Suburban ($35,000); (3) the payments towards the victims' personal credit card bills from NWT's funds ($35,000); (4) the payments towards victims' personal expenses from NWT's funds and the checks vendors paid to NWT that the victims kept ($8,058.80); and (5) the NWT deposits taken by the victims ($16,914,17). Defendant states, "While most of [the third, fourth, and fifth benefits] were made without consent of [Defendant], they should nonetheless be credited to his benefit as it was money received by the alleged victims." Def.'s Mem. 16-17, ECF No. 75.

A defendant is credited for money and property "returned . . . by the defendant" before the offense was detected. U.S.S.G. § 2B1.1 cmt. n.3(E)(i). When determining credit for repayments, the focus is on the defendant's intent. *United States v. Hartstein*, 500 F.3d 790, 798-800 (8th Cir. 2007); *United States v. Brown*, 877 F. Supp. 2d 736, 747

(D. Minn. 2012) (stating that a sentencing court focuses on intent when deciding whether to grant credit for repayments); *see also Staples*, 410 F.3d at 491 (explaining that a court does not subtract repayments from the intended loss amount after a fraud's detection because they "likely do not indicate anything about the defendant's culpability").

Here, Defendant did not return the five purported benefits to the victims; the victims took them. Though Defendant writes in his reply brief that he conferred or otherwise intended the victims to obtain these benefits, Def.'s Reply 2, 17, ECF No. 89, Defendant has admitted he did not consent to many of them. Def.'s Mem. 16-17, ECF No. 75. Indeed, the record shows that Defendant did not intend to provide any of these benefits. First, though Defendant claims that "it is generally accepted that a seller is responsible for the fee," *id.* at 17, the record shows the brokerage fee invoice was sent to Defendant. Def.'s Ex. C, ECF No. 75-3 at 1. Even assuming the victims were responsible for the brokerage fee, Defendant did not intend to pay the fee to mitigate the victims' damages but wanted to be credited for it. Def.'s Ex. K, ECF No. 75-11 at 6. Defendant still complains that "he was never reimbursed for this." Def.'s Mem. 17, ECF No. 75.

Second, Defendant did not return the Chevrolet Suburban to the victims. The victims "retained the vehicle" even though Defendant believed it was his property as NWT's new owner. *Id.* Defendant claims this was a "conversion." *Id*. The record confirms the victim's retention of the vehicle was "out of [Defendant's] control." Def.'s Ex. K, ECF No. 75-11 at 1-2. In an email to the victims' lawyer, Defendant's civil lawyer wrote, "[M]y client does not have an issue with your client taking the Chevy Suburban

but credit then needs to be given to the company for this transaction." *Id.* Again, Defendant did not intend to benefit the victims. The victims took the vehicle and when Defendant found out he wanted them to pay for it.

Finally, Defendant states that the last three benefits "were funds *taken* out of the company that he now owned." Def.'s Mem. 16, ECF No. 75 (emphasis added). NWT emails from the time of the offense confirm the funds were taken, not given by Defendant. Def.'s Ex. H, ECF No. 75-8 at 3, 4, 6, 9; Def.'s Ex. J, ECF No. 75-10 at 2. Emails between the Defendant's civil lawyer and the victims' lawyer further prove that the victims took these benefits without Defendant's consent. *See* Def.'s Ex. K, ECF No. 75-11 at 1, 4-5, 6.

Defendant cannot obtain credit against his intended loss total for benefits he did not intend to confer. S*ee Hartstein*, 500 F.3d at 798-800. Counsel's failure to argue he could obtain credit for these benefits did not prejudice Defendant.

## II. Evidentiary Hearing

A defendant is entitled to an evidentiary hearing on a 28 U.S.C. § 2255 motion "[u]nless the motion and the files and records of the case conclusively show that the [defendant] is entitled to no relief." 28 U.S.C. § 2255(b). A hearing is not required if the defendant's claim is "inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." *Watson v. United States*, 493 F.3d 960, 963 (8th Cir. 2007) (internal quotations and citation omitted).

Here, the record contradicts Defendant's allegation that his former counsel mistakenly failed to argue for a lower loss amount. Counsel explicitly reserved the right

to argue for a lower loss amount and submitted evidence pertaining to the loss amount. Counsel then strategically chose to focus on restitution and leniency under the § 3553(a) factors. Furthermore, even if Defendant's allegations regarding counsel's performance were taken as true, Defendant cannot show he was sentenced under an incorrect guidelines range because Defendant's intended loss arguments fail. The record conclusively shows Defendant did not intend either the misrepresented liabilities or the benefits obtained by the victim prior to the detection of Defendant's fraud. As a result, they cannot be included when calculating Defendant's intended loss.

### III. Certificate of Appealability

An appeal cannot be taken from a final order denying a § 2255 motion without a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(B); Fed. R. App. P. 22(b)(1). The Court cannot grant a COA unless the applicant has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a district court rejects a defendant's claims on the merits, a COA should issue where the defendant shows that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Reasonable jurists would not find the rejection of Defendant's claims debatable. Therefore, the Court does not grant Defendant a COA.

# CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendant's Motion to Vacate, Set Aside, or Correct his Sentence Pursuant to 28 U.S.C. § 2255 [ECF No. 74] is DENIED.

2. A certificate of appealability is DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: April 29, 2021

s/ Joan N. Ericksen<br>
JOAN N. ERICKSEN<br>
United States District Judge